UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-CV-1457-ZMB |
| | ) | |
| CITY OF CLAYTON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' two motions to dismiss, Docs. 39, 41; Defendants' motion to strike Plaintiff Richard Wilson's omnibus response in opposition to dismissal, Doc. 44; and Wilson's "cross-motion," which the Court liberally construes as a motion for leave to file an overlength brief out of time, Doc. 47. The Court grants Wilson's motion for leave to file his response and denies the motion to strike as moot. However, Wilson's Second Amended Complaint fails to allege a cognizable violation of his constitutional rights, even with his proposed supplemental facts. Because of these shortcomings, the Court grants Defendants' motions, dismisses the federal claims, and declines supplemental jurisdiction over all state-law claims.

## BACKGROUND

I.      **Factual Background[1]**

Wilson is a licensed private investigator and process server who had an office in Clayton, Missouri. Doc. 36 ¶¶ 1, 8, 90. He alleges that the Clayton Police Department (CPD) racially profiled him as a black man, unlawfully seized him, and retaliated against him, while other city officials condoned this and similar misconduct. Wilson's complaint focuses on two encounters he had with the police in 2022, with his claims stemming primarily from the latter incident.

---

[1] As required at this stage, the Court accepts as true Wilson's well-pled facts. *See* Doc. 36; *infra* at 5.

First, on February 18, 2022, Wilson was in his office when his building's property manager reported him as a trespasser to the police. *Id.* ¶ 11. CPD Officers Ryan Riley and Andrew Blandford queried the license plate number the property manager provided, determined that the vehicle belonged to Wilson, and arrived on scene to speak with him. *Id.* ¶¶ 12–13. Despite acknowledging that Wilson had not committed a crime, Riley and Blandford asked him for his identification to check for warrants and "threaten[ed] continued detention if he refused to comply." *Id.* ¶ 14. After consulting an attorney, Wilson provided his identification, and the officers performed the background check. *Id.* ¶¶ 15–16.

Wilson later filed a complaint against the property manager for filing a false report, but the Clayton prosecutor's office declined charges. *Id.* ¶¶ 17–19. Wilson then decided to make a video about "the occurrences," and unnamed "Clayton police officers were made aware of the video." *Id.* ¶ 20. Wilson also claims that the property manager "entered into some sort of agreement" with a CPD officer. *Id.* ¶ 21. Thereafter, the police began "loitering in the building's lobby in plain view of [Wilson]," which created a "hostile environment" and eventually led to him being "constructively evicted" from his office. *Id.* ¶¶ 22–23.

Then came the night of November 1, 2022. Wilson was in his office with a client after hours when he noticed flashes of light from outside. *Id.* ¶¶ 28–29. He opened the window and saw that the lights were coming from two CPD officers outside the building. *Id.* Wilson recognized the officers—Defendants Michael George Zuniga and Keaton Alan Fogler—because they regularly patrolled the building following the February incident. *See id.* ¶¶ 22, 25–27, 30. After opening the window, Wilson "introduced himself to the officers" and informed them he was "still conducting business" in the office. *Id.* ¶ 31. The officers "immediately demanded that [he] produce identification 'to prove that he belonged' in his office." *Id.* ¶ 32. Wilson refused the request and closed the window, which enraged the officers. *Id.* ¶¶ 34–35.

2

Zuniga and Fogler then "broke into the locked office building," unholstered their firearms, and "confronted [Wilson]." *Id.* ¶¶ 35–37. The officers "angrily and loudly" knocked on Wilson's office door, "demanding that he exit with hands up." *Id.* ¶ 38. Wilson's client left and passed the officers without incident. *Id.* ¶¶ 41–42. Wilson followed shortly thereafter and "quietly walked towards the elevators," but Zuniga and Fogler "blocked his path" and stated that "he was not free to leave." *Id.* ¶ 43. Wilson pointed to his name on the door and told them it was his office. *Id.* ¶ 44. The pair acknowledged he was a tenant but still insisted on seeing his identification. *Id.* ¶ 45. When Wilson again refused, Zuniga and Fogler laughed at him and mocked him. *Id.* ¶ 48. Wilson claims the officers then "escalated their response by detaining him" in that they blocked his route to the elevator and exits. *Id.* Nevertheless, Wilson was able to immediately exit via a flight of stairs, get into his car, and drive away. *Id.* ¶¶ 49–53. On his way out, however, Zuniga and Fogler "menacingly" followed Wilson while "holding" their guns and continued to request ID despite admitting he was not suspected of a crime. *Id.* They and other unnamed officers also mocked Wilson and wrote down his license plate number as he left. *Id.* ¶¶ 52–54.

Wilson later reported this incident to Clayton officials, including Defendants Michelle Harris (the Mayor), David Gipson (the City Manager), and Mark Joseph Smith (the Chief of Police). *Id.* ¶¶ 59–60. "Instead of taking disciplinary actions or investigating the misconduct," Smith responded by sending a CPD-wide email identifying Wilson as "someone who carries a firearm [and] believes he should not identify to police officers unless he is suspected of a crime." *Id.* ¶¶ 60–61. Wilson claims that characterization was "not only misleading but also . . . emboldened further [unspecified] retaliation." *Id.* ¶ 62–63. Wilson also alleges that unnamed CPD officers encouraged building management to post "No Firearms Allowed" signs because Wilson "was known to legally carry a firearm." *Id.* ¶ 65.

3

## II.     Procedural Background

Wilson brought this civil-rights action in October 2024. Doc. 1. Defendants moved to dismiss his initial complaint, Docs. 7, 9, and Wilson responded with overlength briefs, Docs. 11, 13. The Court denied Defendants' motions to strike the overlength briefs. Docs. 16, 17. Wilson then moved for leave to file an amended complaint, Doc. 18, which the Court denied without prejudice and instructed Wilson as to what he needed to include in any future amended complaint, Doc. 35.

Wilson then filed his operative Second Amended Complaint ("Complaint") in July 2025. Doc. 36. In it, Wilson advances 11 counts, including claims under 42 U.S.C. § 1983 for unlawful seizure, racial discrimination and unequal treatment, conspiracy to interfere with civil rights, and retaliation for the exercise of various constitutional rights. *Id.* ¶¶ 69–167. Wilson also asserts supervisory "negligence" claims against the Mayor and City Manager, as well as related state-law tort claims. *Id.* Each count is brought against a combination of the individual defendants in both their individual and official capacities and against the City of Clayton itself. *Id.*

Defendants again moved to dismiss, arguing that the Complaint still fails to state a claim and that they are entitled to qualified immunity. *See* Docs. 39–42. Wilson responded by filing another overlength brief, Doc. 43, which Defendants sought to strike as oversized, out of time, and improperly raising new factual allegations. Doc. 45 at 1–2. Wilson then sought leave to file out of time. Doc. 47. Defendants did not file further responsive briefs, and the matter is now ripe for resolution.

## LEGAL STANDARD

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The purpose of such motions "is to test the legal sufficiency of the complaint." *Ford v. R.J. Reynolds Tobacco Co.*, 553 F. Supp. 3d 693, 697 (E.D. Mo. 2021). To survive a Rule 12(b)(6) motion, the complaint must include "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief" and provide notice of the grounds on which the claim rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). Additionally, the complaint must include sufficient detail to make a claim "plausible on its face."

4

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). While "[s]pecific facts are not necessary," the plaintiff must include "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Delker v. MasterCard Int'l*, 21 F.4th 1019, 1024 (8th Cir. 2022) (quotations omitted). The question is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of the claim. *Id.*

At the motion-to-dismiss stage, the Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See Brokken v. Hennepin Cnty.*, 140 F.4th 445, 450 (8th Cir. 2025) (citation omitted). But the Court does not "presume the truth of legal conclusions." *Jones v. City of St. Louis*, 104 F.4th 1043, 1046 (8th Cir. 2024) (citation omitted); *see also Kulkay v. Roy*, 847 F.3d 637, 641 (8th Cir. 2017) ("[T]he court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."). Ultimately, this analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

Additionally, it is well settled that "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Rivera v. Bank of Am.*, 993 F.3d 1046, 1050 (8th Cir. 2021) (citation omitted). On a motion to dismiss, "the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework" so long as "the essence of an allegation is discernible." *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015) (citation omitted). However, while "pro se complaints are to be construed liberally, they still must allege sufficient facts to support the claims advanced." *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (collecting cases). Thus, even under this forgiving standard, the Court will not "assume facts not alleged" or "excuse the *pro se* litigant from following the Court's local rules or the Federal Rules of Civil Procedure." *Whitlock v. St. Louis Cnty.*, No. 4:21-CV-516-SEP, 2022 WL 3700915, at *2 (E.D. Mo. Aug. 26, 2022) (collecting cases).

**DISCUSSION**

Even after construing the Complaint in the light most favorable to Wilson, the Court finds that he fails to state a federal claim for relief.[2] Nor would this conclusion change in light of the new facts he improperly alleges in his response brief. As such, the Court grants the motion to dismiss, declines to reach the merits of the state-law claims, and dismisses the entirety of this action.

**I.      Count I: Unlawful Seizure**

Wilson first claims that Zuniga and Fogler unlawfully seized him during the November encounter. Doc. 36 ¶¶ 69–78. Defendants argue that this count should be dismissed because Wilson merely has pled an "unactionable attempted seizure" in that he admits to rebuffing the officers' "show of force.". Doc. 42 at 2. For his part, Wilson insists he was seized the moment officers told him he was not free to leave. Doc. 43 at 6. And instead of acknowledging that he evaded officers, Wilson states he "responded with professionalism, restraint, and strategic judgment" during the encounter, spoke briefly with them, and then "walked down the flight of stairs." *Id.* at 7–8. Because the Complaint confirms he never submitted to the alleged show of authority, Wilson fails to plead a violation of his Fourth Amendment rights.

To plead an unlawful-seizure claim, a plaintiff must show both that "a seizure occurred and [that] the seizure was unreasonable." *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003) (citation omitted). A person is "seized" within the meaning of the Fourth Amendment "when an officer restrains the[ir] liberty . . . through physical force or show of authority." *Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 839 (8th Cir. 2021). Absent the application of physical force, a seizure occurs only where there is "*submission* to the assertion of authority." *United States v. Houston*, 2017 WL 11500372, at *5 (S.D. Iowa Oct. 5, 2017) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)); *see also*

---

[2] Defendants are correct that Wilson's brief is both untimely and overlength. Doc. 44. Despite Wilson's awareness of these requirements from prior motions to strike, *see* Docs. 14–15, the Court again extends him grace as a pro se litigant and accepts his deficient brief, as requested. Doc. 47. Thus, Defendants' Motion to Strike, Doc. 44, is denied as moot.

6

*Johnson v. City of Ferguson*, 926 F.3d 504, 506 (8th Cir. 2019). Even then, a person is seized only if "a reasonable person would have believed he was not free to leave" under the circumstances. *United States v. Lillich*, 6 F.4th 869, 875–76 (8th Cir. 2021) (citation omitted) (identifying relevant factors).

As alleged in the Complaint, Zuniga and Fogler "broke into the locked office building without a warrant" and then "angrily and loudly knocked on [Wilson's office] door[,] demanding that he exit with [his] hands up." Doc. 36 ¶¶ 36, 38. Although it is unclear, Defendants may have had their firearms unholstered at this point. *See id.* ¶¶ 36, 51. But Wilson did not exit with his hands up or otherwise submit to the officers' demands. Instead, he "exited his office, and quietly walked toward the elevators." *Id.* ¶ 43. While "Defendants blocked [Wilson's] path, telling him he was not free to leave," *id.*, the Complaint makes clear he saw things differently. After "point[ing] to his name on the office door" to identify himself, Wilson flatly refused to provide his identification, walked down the stairs, entered his car, and drove away. *Id.* ¶¶ 43–54.

Wilson suggests he was seized because a reasonable person would not have felt free to leave after the officers told him not to do so. While this argument has internal logic, it is predicated on the faulty premise that the reasonable-person standard applies here.[3] It does not. As the Eighth Circuit has recognized, "[i]t is not sufficient for the police to only *attempt* to stop the individual; police must *actually* stop him." *United States v. Flores-Lagonas*, 993 F.3d 550, 560 (8th Cir. 2021) (finding no seizure where officers attempted to stop a suspect, with guns drawn, but the suspect

---

[3] Even under the reasonable-person standard, Wilson ignores many factors that cut against him. Although the officers blocked Wilson's path to the elevator, they evidently left open the route to the stairs—which Wilson took when he ended the encounter. *See Lillich*, 6 F.4th at 876 (noting that, while officers positioning themselves in a way to block a path of escape is a relevant factor, the availability of other ways to terminate an encounter weighs against finding a seizure). There was no allegation of physical touching or retention of personal property. And far from being told he was the subject of an investigation, Wilson acknowledges that the officers reassured him that he was not a suspect. Doc. 43 at 7; *see United States v. Carpenter*, 462 F.3d 981, 985 (8th Cir. 2006) ("A seizure does not occur simply because a police officer approaches an individual and asks a few questions." (quotation omitted)). But most striking of all is the fact that Wilson nevertheless felt "at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (citation omitted).

drove away).[4] That holding traces to Justice Scalia's characteristically insightful analysis in *Hodari D*. He explained that "[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *Hodari D.*, 499 U.S. at 626. But it "does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee." *Id.* The same is true here.

Wilson's allegations make clear that he never submitted to the officers' show of authority. Wilson paused briefly to point to his name on the door but refused to produce the requested identification. Doc. 36 ¶ 43–48. And when officers pressed him further, he terminated the encounter by availing himself of the escape route apparently available to him. *Id.* ¶ 48. Similarly, in *Cloud*, the suspect answered the officer's initial questions and provided his cell phone, but there was no seizure because he "disobey[ed] a police order . . . [and] conduct[ed] himself the way that he, not the police, desired." 994 F.3d at 245. Thus, even if "a reasonable person would have concluded that he was not free to leave" when officers told him he was not free to leave while displaying firearms, a seizure did not occur because Wilson "did not acquiesce to a show of authority by police." *See id.* at 244–46. And any potential claim of "passive acquiescence" is negated by the fact that Wilson "ignored police orders and moved about the scene without restraint, hinderance, or regard to the officers' presence." *Id.* at 246 (cleaned up). As such, there was no

---

[4] While the Eighth Circuit has made it clear that "[a] seizure does not occur unless the individual actually submits to the 'show of authority,' *see Flores-Lagonas*, 993 F.3d at 560, it does not appear to have expressly found the reasonable-person test inapplicable where an individual rebuffs a show of authority. But at least several other circuits have reached this conclusion. *See, e.g.*, *United States v. Cloud*, 994 F.3d 233, 243–246 (4th Cir. 2021) (holding that, despite finding that a reasonable person would not feel free to leave, no seizure occurred because the person disobeyed orders after answering a few questions); *Carroll v. Ellington*, 800 F.3d 154, 170 (5th Cir. 2015) (concluding that an "initially consensual encounter did not become a seizure when [a deputy] ordered [the suspect] to stop and return to the patrol car because [the suspect] walked away into his garage and did not submit to [the deputy's] show of authority."); *United States v. Washington*, 12 F.3d 1128, 1132 (D.C. Cir. 1994) ("Although a reasonable person would not have believed that she was free to continue driving" after an officer activated sirens and ordered a vehicle to stop, the defendant "was not seized within the meaning of the Fourth Amendment" where she "did not in fact submit to the officer's order" by driving off after initially stopping). This Court is likewise convinced that if someone acts in an objectively unreasonable manner in response to a directive from law enforcement, they should not benefit from a finding that a seizure occurred solely based on how a reasonable person would have responded under the circumstances.

seizure because Wilson never actually submitted to a show of authority, so the Court must dismiss his Fourth Amendment claim.

## II.   Counts II and IX: Retaliation for the Exercise of Constitutional Rights

Wilson's next set of claims concerns retaliation for the exercise of his constitutional rights. In Count II, Wilson alleges he was retaliated against for exercising his First Amendment rights. Doc. 36 ¶¶ 79–87, 143–50. He then reiterates and expands on that claim in Count IX, broadening his contention to include retaliation related to the First, Second, Fourth, and Fifth Amendments. Doc. 36 ¶ 144. Zuniga and Fogler argue that their retaliation claims must be dismissed because Wilson fails to plead that they had acted with a retaliatory animus—much less had knowledge of his protected activity—or that any injury stemmed from their actions. *See* Doc. 42 at 3–4, 9. As for Smith, he argues that Wilson has not shown that his actions would chill a person of ordinary firmness from further engaging in protected activity. *Id.* at 4, 9. Wilson does not directly dispute that the officers were unaware of his past protected activity, but he does argue that Smith's email would chill an ordinary person from engaging in protected activity. Doc. 43 at 9.

To prove a retaliation a claim, Wilson must show: (1) that he engaged in constitutionally protected activity; (2) that Defendants caused an injury to him that would chill a person of ordinary firmness from continuing in that protected activity; and (3) a causal connection between their retaliatory animus and Wilson's injury. *Nieters v. Holtan*, 83 F.4th 1099, 1110 (8th Cir. 2023) (applying this framework to a First Amendment claim); *Congden v. Mich. Dep't of Health & Hum. Servs.*, 2018 WL 2431605, at *3 (E.D. Mich. May 29, 2018) (same for Second Amendment retaliation), *Abdulrazzak v. Smith*, 2018 WL 4625409, at *14 (D.S.D. Sept. 26, 2018) (analyzing a Fifth Amendment retaliation claim under a similar framework). For the second element, Wilson must both show "that the government official took adverse action against him" and also "that the adverse action taken would chill a person of ordinary firmness from continuing in the activity." *Peet v. City of Sikeston*, No. 1:25-CV-55-SNLJ, 2025 WL 2576514, at *9 (E.D. Mo. Sept. 5, 2025) (citation omitted). Wilson also must show but-for causation between the adverse action and the Defendants' animus. *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022) (citation omitted).

9

But there is no but-for causation if "the response was driven not by 'animus' but by [the officers'] understanding—however mistaken—of [their] official duties." *Id.* (citation omitted).

Wilson's First Amendment claims against Zuniga and Fogler fail for at least two reasons. First, Wilson's protected activity relates to his refusal to comply with Officers Riley and Blandford during the February incident and his later complaints to city officials. *See* Doc. 36 ¶¶ 20, 81–82. But the Complaint does not include any non-conclusory allegation that *Zuniga and Fogler* knew about this conduct, precluding a finding of retaliatory animus. *See Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996) (affirming dismissal for failure to show specific defendants knew of or were affected by protected activity). Second, while they mistakenly cite the higher probable-cause standard, *see* Doc. 42 at 3,[5] Defendants are correct that Wilson must plead the absence of even "arguable reasonable suspicion" to show retaliation. *See Waters v. Madson*, 921 F.3d 725, 742 (8th Cir. 2019). Wilson aids Defendants in this regard by supplying the police report that is embraced by his Complaint, *see* Doc. 36 ¶ 56, which reveals why they "re-engaged" Wilson and contextualizes the events that followed. Specifically, the officers were investigating a trespasser at the building after midnight, and Wilson (who was wearing a wig) refused to provide identification so that officers could verify he was a business owner. *See* Doc. 43-1 at 9–10. Thus, Wilson not only fails to plead the absence of reasonable suspicion; he helps establish it.[6] *See Prunty v. City of Hot Springs*, 2013 WL 4523220, at *3 (W.D. Ark. Aug. 27, 2013) (dismissing retaliation claim for similar reasons); *see also Williams v. First Nat'l Bank*, No. 4:14-CV-1458-ERW, 2014 WL 5800199, at *4 (E.D.

---

[5] Defendants raise a similar argument as to Count I. *See* Doc. 42 at 2. While not necessary for the Court's conclusion, for the reasons discussed in this section, the presence of arguable reasonable suspicion provides a separate basis to dismiss the seizure claim. *See United States v. Harris*, 617 F.3d 977, 978–79 ("The Fourth Amendment is not violated if the officer making an investigative stop has a reasonable suspicion of criminal activity." (citation omitted)).

[6] Assuming Wilson was exercising his Fourth and Fifth Amendment rights by refusing to acquiesce to demands for identification, the claims similarly fail because the assertion of those rights was accomplished through his First Amendment refusal to provide identification, and in any event, such claims would fail for identical reasons. Further, the Eighth Circuit previously cast down on the existence of a clearly established right to be free from retaliation for the exercise of Fourth Amendment rights. *See Hess v. Ables*, 714 F.3d 1048, 1052–53 (8th Cir. 2013)

Mo. Nov. 7, 2014) (noting that courts are free to consider "documents upon which the pleadings rely") (collecting cases).

Wilson likewise fails to state a First Amendment retaliation claim against Smith. He claims that Smith "retaliated against him by circulating an internal email that labeled [him] as someone who carries a firearm and 'believes he should not identify to police unless suspected of a crime,'" which purportedly "incited further hostility from law enforcement and placed [him]" at a greater risk of harassment. Doc. 36 ¶ 83. As an initial matter, Wilson's contention that Smith "mischaracterized" his views is unfounded. The Complaint makes it clear that, at least after the February incident, Wilson believed he should not provide identification to police unless he was accused of a crime.[7] *See* Doc. 36 ¶¶ 14–16, 47–50; *Williams*, 2014 WL 5800199, at \*4 ("Courts need not accept as true 'factual assertions that are contradicted by the complaint itself . . . .'"). Moreover, the mere act of sending an email identifying Wilson and his speech is insufficient to deter a person from engaging in further protected speech. Even if this communication were intended to identify and mock Wilson, that alone is insufficient to chill a person of ordinary firmness. *See Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) (posting pictures to ridicule a citizen was "offensive, unprofessional and inappropriate" but inadequate for a retaliation claim); *see also Brown v. Linder*, 606 F. Supp. 3d 890, 897 (S.D. Iowa 2022) ("A defendant making harassing, derogatory, and humiliating comments is insufficient to deter a person of ordinary firmness from continuing to speak out." (quotation omitted)). As such, Smith's email does not support a retaliation claim.

---

[7] Once again, Wilson undermines his claim by providing evidence of what actually occurred—here, Smith's email. *See* Doc. 43-1 at 12. That email directly contradicts his contention that the email was "signaling to all Clayton police officers that he [Wilson] should be treated with suspicion and hostility merely for exercising his inalienable constitutional rights." Doc. 43 at 2. *But see* Doc. 43-1 at 12 ("Due to the nature of his work and the issues in his building, we could encounter Wilson again. *I want to make sure everyone is prepared on how to deal with him in a professional manner.* He may not identify himself, but you'll know who [he] is and where he works. That might be sufficient enough information unless he is suspected of committing a crime." (emphasis added)).

Finally, Wilson's Second Amendment retaliation claims fail for similar reasons. He asserts that Zuniga and Fogler retaliated against him for unspecified "past protected conduct." Doc. 36 ¶ 146. But Wilson fails to allege either officer knew he had a firearm during either the February or November encounters, which again is fatal to his claim. *See Atkinson*, 91 F.3d at 1129. Wilson also alleges that Smith "contributed to the retaliatory environment by disseminating internal communications that portrayed [his] constitutionally protected behavior as a threat to police authority." *Id.* ¶ 147. Yet, once again, this claim fails because circulating the email would not chill a person of ordinary firmness from carrying a gun. As such, Wilson fails to plead retaliation.

**III.    Counts III and VIII: Equal-Protection Claims for Race and National-Origin Discrimination**

Next, Wilson asserts that the conduct of Zuniga, Fogler, and Smith amounts to racial and national-origin discrimination, in violation of the Fourteenth Amendment's Equal Protection Clause. "The Constitution prohibits selective enforcement of the law based on considerations such as race." *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). A plaintiff's allegation that he was stopped or seized on account of his race or national origin is analyzed as a selective-enforcement claim. *See id.* (race); *Parada v. Anoka Cnty.*, 481 F. Supp. 3d 888, 899 (D. Minn. 2020) (national origin). Any "selective-enforcement claim requires proof that the officer exercised their discretion to enforce the laws on account of the plaintiff's race, nationality, or other suspect classification and that enforcement of the law had a discriminatory effect and purpose." *Parada*, 481 F. Supp. 3d at 899 (citing *Crooks*, 326 F.3d at 1000). To prove discriminatory effect and purpose, a "plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose." *Crooks*, 326 F.3d at 1000. A "class-of-one" equal-protection claim is actionable where "a plaintiff alleges that a defendant intentionally treated [them] differently from others who are similarly situated." *Mathers v. Wright*, 636 F.3d 396, 399 (8th Cir. 2011).

12

The Complaint fails to identify any similarly situated individual who was treated differently. In Count III, Wilson simply states that Zuniga and Fogler "treated [him] differently than they would have treated a similarly situated white tenant or business owner under identical circumstances." Doc. 36 ¶ 93. Wilson does not even make that bare allegation about Smith. *See id.* ¶¶ 88–97. In Count VIII, Wilson claims that "similarly situated white tenants and business owners in the building were not treated with the same hostility, suspicion, or aggression." *Id.* ¶ 138. But this allegation is conclusory, with no facts suggesting that other tenants had interacted with law enforcement under similar circumstances (e.g., middle of the night). As such, this failure alone justifies dismissing his equal-protection claims. *See Henke v. City of Orono*, 2014 WL 5475020, at *3 (D. Minn Oct. 29, 2014) (dismissing an equal-protection claim where a plaintiff "fail[ed] to allege any facts establishing that defendants treated him differently than other similarly situated persons").

Moreover, the Complaint does not adequately allege a selective enforcement of the law. As noted above, Wilson was not seized or cited for any violations of the law. And although "a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim." *Flowers v. City of Minneapolis*, 558 F.3d 794, 799–800 (8th Cir. 2009). Further, Wilson does not allege that Smith did anything related to enforcing the law, as opposed to supervising other officers. Because the Complaint fails to identify any similarly situated person was treated differently or how any Defendant selectively enforced the law, Wilson fails to state a claim for relief.

## IV.   Count IV: Conspiracy to Interfere with Civil Rights

Wilson also brings a section 1983 claim for conspiracy to deprive him of his First, Fourth, and Fourteenth Amendment rights. Doc. 36 ¶ 103. But a plaintiff must "prove a deprivation of a constitutional right or privilege in order to prevail on a [section] 1983 conspiracy claim." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008). As noted above, there are no underlying First, Fourth,

or Fourteenth Amendment violations.[8] Therefore, there is no claim for a conspiracy to deprive him of those rights, and the claim similarly must be dismissed.

## V.   Counts X–XI, *Monell* Liability, and Official-Capacity Claims

Wilson further alleges liability against the City of Clayton (either by name or through *Monell* and official-capacity claims) for some of the counts discussed above, as well as failure to train, supervise, implement policies, or to "intervene after official notice." Doc. 36 ¶¶ 69–104, 143–167. However, the Eighth Circuit has made clear that, without an underlying constitutional violation, there can be no liability against a political subdivision. *Brabbit ex rel. Bild v. Capra*, 59 F.4th 349, 354 (8th Cir. 2023) ("Because there is no cognizable constitutional violation, there is no basis for *Monell* liability."). The same is true of any failure-to-train-or-supervise claim. *See Braun v. Burke*, 983 F.3d 999, 1003–04 (8th Cir. 2020) (affirming dismissal of a failure-to-train-or-supervise claim where qualified immunity was granted for the underlying constitutional violations). Because Wilson does not sufficiently plead an underlying constitutional violation, the Court dismisses the claims against the City.

## VI.   Counts V–VII: State-Law Claims

Wilson also advances several state-law claims, invoking this Court's supplemental jurisdiction. Doc. 36 at 4 (citing 28 U.S.C. § 1367). But the Eighth Circuit has indicated that district courts ordinarily should decline supplemental jurisdiction over state-law claims when the underlying federal claims are dismissed. *See Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 726–27 (8th Cir. 2008) (citations omitted). While a court weighs the factors of "judicial economy, convenience, fairness, and comity" when determining whether to exercise pendent jurisdiction over

---

[8] Additionally, beyond the conclusory allegation in paragraph 100, the only agreement Wilson identifies is one between the property owner and "Blanchet" to have police "loiter[] in the building's lobby." Doc. 36 ¶¶ 21–22. None of the Defendants were parties to this alleged conspiracy. Wilson previously was cautioned that "he must specifically allege which Defendants were involved in the conspiracy and 'allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement.'" Doc. 35 at 9 n.3 (citation omitted). Thus, even if there were any underlying constitutional claims, Wilson conspiracy claim independently fails on this ground.

14

state-law claims, "[i]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Wilson v. Miller*, 821 F.3d 963, 970–71 (8th Cir. 2016) (citations omitted). That general rule applies here, and because none of the discretionary factors favor retaining jurisdiction of the state-law claims, this Court will decline supplemental jurisdiction over those claims.

## VII.    Implied Request for Leave to Amend

Finally, the Court addresses Wilson's belated effort to once again amend his complaint. Wilson attempts to add new claims in his response brief, which is improper. *See Al-Saadoon v. Barr*, 973 F.3d 794, 805 (8th Cir. 2020) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (quotation omitted)). Indeed, the Court previously warned him that all allegations needed to be included in any amended complaint. Doc. 35 at 8 ("First, Plaintiff is advised that his second amended complaint must include all of the claims and factual allegations he wishes to assert."). Accordingly, the new facts are not properly before the Court, and there is no obligation to consider them. *See Germany v. DAS Acquisition*, 4:25-CV-748-ZMB, 2026 WL 160869, at *3 n.5 (E.D. Mo. Jan. 21, 2026). But even construing Wilson's response as an implicit request to amend or supplement the Complaint with the facts asserted, the Court would deny such leave on futility grounds. *See Munro v. Lucy Activewear, Inc.*, 899 F.3d 585, 589 (8th Cir. 2018) ("[W]hen the court denies leave on the basis of futility, it means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) . . . ." (citation omitted)).

For Count I, Wilson adds new facts but still fails to show that he was seized. Wilson now claims he "stopped, requested of Defendants Zuniga and Fogler the reason for the detainment," and "asked [them] what crime he was being accused of committing." Doc. 43 at 6. After that interaction, Wilson stated he "then made the decision to walk to the staircase when Defendant

15

Zuniga blocked the elevators." *Id.* Wilson also notes that he "initiated the only verbal engagement with Defendants that evening" and "complied with an unlawful order to stop." *Id.* at 7. But none of these facts alter the conclusion that—because Wilson never actually submitted to a show of authority—he was not seized. Nor would this conduct amount to the level of "passive acquiescence" that might give rise to a seizure, as Wilson still admits he refused to hand over his identification and left down the staircase. Doc. 43 at 6–8. As such, Wilson "ignored police orders and moved about the scene without restraint," defeating any claim of passive acquiescence. *Cloud*, 994 F.3d at 246. Further, Wilson confirms that Defendants did not block all exits, *see* Doc. 43 at 6 ("Plaintiff then made the decision to walk to the staircase when Defendant Zuniga blocked the elevators."), so there were available avenues to escape the encounter, *see Lillich*, 6 F.4th at 876. While Wilson notes he "stop[ed] and turn[ed] back on numerous occasions – in fear and apprehension," and was told that they were "going to record his license plates" Doc. 43 at 8, none of this deterred him from leaving. As such, the new allegations do not change the fact that Wilson was not seized.

Next, Wilson adds a new First Amendment retaliation claim. This time, he claims that the protected activity occurred when he told Defendants, "You'd be stupid (I would be stupid) to think I'd hide in my office and then call out to you." Doc. 43 at 9. The relevant adverse action was that Zuniga or Fogler ran Wilson's license plate number through a database, "manipulating data to link the business vehicle to [him] personally, and initiating a warrant check." *Id.* And Wilson suggests that "[t]hese acts, carried out in anger and not grounded in any investigatory need, constitute classic retaliation for protected speech." *Id.* Wilson also asserts that Zuniga "retaliated [against him] by . . . [inputting his] full DOB and full SSN into an internal document [a police report] — a clear act of retaliation." *Id.* at 6. It is true that criticizing police officers is a core activity protected by the First Amendment. *See City of Houston v. Hill*, 482 U.S. 451, 461 (1982). But running a license plate and warrant check—an activity that officers perform on a daily basis—would not chill a

16

person of ordinary firmness. *See Naucke*, 284 F.3d at 928. Nor would the act of putting Wilson's identifying information into a police report to document the encounter. Those acts would trivialize the First Amendment, and it is the Court's duty to screen out such claims. *See Bennie v. Munn*, 58 F. Supp. 3d 936, 943 (D. Neb. 2014). Moreover, even assuming that performing such a search would chill the speech of a person of ordinary firmness, Wilson has effectively pled a retaliatory-search claim, and he fails to allege but-for causation.[9] Either way, the additional allegations do not salvage Wilson's First Amendment retaliation claim.

As to the Second Amendment, Wilson now asserts that Zuniga and Fogler were made aware of his firearm during the encounter and retaliated against him by convincing the building manager to add the "no firearms allowed" sign. Doc. 43 at 9–10. Despite it being a building-wide sign, Wilson implausibly states that he was "targeted specifically . . . while ignoring the presence of other armed tenants." *Id.* at 10. There are multiple issues with this claim. First, Missouri law allows landlords to restrict possession of firearms on private property. *See* MO. REV. STAT. § 571.107.1(15) ("No concealed carry permit . . . shall authorize any person to carry concealed firearms into . . . [a]ny private property whose owner has posted the premises as being off-limits to concealed firearms."). Second, the fact that the building owner acted, apparently without pressure, to put up the sign breaks but-for causation. *Cf. Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175, 191 (2024) (recognizing a government actor can be liable for coercing a third party into suppressing speech). Finally, Wilson's claim that he was "targeted" is without foundation considering his allegation that other tenants were similarly affected.

---

[9] Although the Eighth Circuit has yet to consider the standard for a retaliatory-search claim, both the Fourth and Fifth Circuit have recognized their existence. *Stanley v. Bocock*, 160 F.4th 573, 578 (4th Cir. 2025); *Degenhardt v. Bintliff*, 117 F.4th 747, 758 (5th Cir. 2024). However, as the Fourth Circuit has explained, there is a but-for causation requirement of "plead[ing] the absence of probable cause or show [a] narrow exception to that requirement," which is not pertinent here. *Stanley*, 160 F.4th at 578. As noted above, far from pleading the absence of probable cause, Wilson has introduced evidence that probable cause did exist. Additionally, as relevant here, Wilson admits he shouted the "you'd be stupid" remark while Zuniga and Fogler were outside and before Wilson identified himself as a tenant. Doc. 43 at 9. As such, even assuming that looking up Wilson's license plate number and performing a warrant check constitutes a search, Wilson's own pleadings make clear that Zuniga and Fogler had probable cause to perform it.

17

Finally, for the equal-protection claims, Wilson adds that he "was stopped and asked to prove his right to be on the premises, even though attorneys, therapists, and other professionals work there at similar hours." Doc. 43 at 11. He also claims that another white tenant "reported that one late night, Clayton police once entered her office to make [i]nquiries, but they did not request her identification or attempt to run her name for warrants." *Id.* at 18. As stated above, there is no class-of-one claim for a choice to make an investigation into a person. *Flowers*, 558 F.3d at 799–800. Further, the document attached to Wilson's response makes clear that the client he notes officers let go "unmolested," Doc. 36 ¶ 41, was also black, *see* Doc. 43-1 at 10. Thus, a similarly situated person who shares the same suspect classification as Wilson was, in fact, treated differently. That diminishes, rather than bolsters, his equal-protection claim. At a minimum, though, the additional facts fail to cure the other identified issues with his claims in Counts III and VIII.

In sum, none of the allegations—either in the Complaint or in the response brief—support a claim that Wilson's federal constitutional rights were violated.[10] As such, he fails to state any cause of action that this Court can entertain, and his case must be dismissed.

---

[10] After examining the attachments to his response brief, the Court is compelled to issue a parting warning to Wilson. All parties, whether proceeding pro se or with the representation of counsel, are bound by a duty of candor to the Court. Unfortunately, there are reasons to doubt the veracity of some allegations in the Complaint. For example, the attachments indicate that CPD officials reviewed a complaint lodged by Wilson and, contrary to his claim, Zuniga and Fogler never pointed their firearms at him. *See* Doc. 43-1 at 2. The attachment also indicates Wilson's YouTube channel has a video capturing the interaction, which appears to contradict his allegations. *See* WILCORP CONSULTANTS LLC - JUSTICE PRIVATE EYES, *Police in Clayton, Missouri Attacked a Black Business Owner in His Office- Demanding I.D.* (YouTube, Dec. 30, 2023) [https://perma.cc/KFN5-GW5F]. While the Court did not rely on this video for purposes of the instant motion (even though it likely could do so, *see Taylor v. Buck*, 2024 WL 5452667, at *1 (D. Minn. Nov. 19, 2024)), it cautions Wilson that court filings must include only information that is true or at least known to be true upon information and belief. In any future cases, Wilson should be mindful to avoid crossing from persuasive license with the facts into stark mischaracterizations or demonstrative falsehoods. His failure to do so in this Court can and will result in potential sanctions. *See Carman v. Treat*, 7 F.3d 1379, 1382 (8th Cir. 1983).

18

## CONCLUSION

Accordingly, the Court **GRANTS** Plaintiff Richard Wilson's [47] motion for leave to file an overlength brief out of time and **DENIES** Defendants' [44] Motion to Strike as moot. Further, the Court **GRANTS** Defendants' [39] [41] motions to dismiss and **DISMISSES** this action without prejudice. The Clerk of Court is directed to close this case.

So ordered this 9th day of March 2026.

_____
ZACHARY M. BLUESTONE
UNITED STATES DISTRICT JUDGE